ROSE SCAGLIONE, PLAINTIFF-APPELLANT, v. ST. PAUL-MERCURY INDEMNITY COMPANY, A CORPORATION AUTHORIZED TO DO BUSINESS IN NEW JERSEY, DEFENDANT-RESPONDENT.

Argued September 8, 1958—Decided October 20, 1958.

See also 26 *N. J.* 225, 139 *A. 2d* 288.

*Mr. Archibald Kreiger* argued the cause for appellant (*Mr. Newton M. Roemer,* on the brief; *Messrs. Bornstein, Kohlreiter & Rubinson,* attorneys).

*Mr. Harvey G. Stevenson* argued the cause for respondent (*Messrs. Stevenson and Willette,* attorneys).

The opinion of the court was delivered by

HEHER, J.   In this action at law to enforce an award of compensation under *R. S.* 34:15–7 *et seq.* against the employer's insurer, as provided by *R. S.* 34:15–86, the Appellate Division of the Superior Court reversed a judgment for the plaintiff, 46 *N. J. Super.* 363 (*App. Div.* 1957), as *coram non judice* for want of due service of the petition for compensation by the Division of Workmen's Compensa-

tion according to *R. S.* 34:15–52. It was found that while one Sidney Kosloy, upon whom as "manager" of the employer service of the petition was made on January 22, 1954, and of an amended petition on October 14 ensuing, "was an agent of the partnership [employer] until its dissolution in June 1953," he "was not in the employ of the partnership after June 1953"; he was not "a managing or general agent of the partnership after June 1953, because the partnership was dissolved and the partnership business was terminated in June 1953," and "[h]e had nothing to do with the partnership after that date." We certified the cause for appeal.

There is every reason to believe, as we shall see, that Kosloy informed the defendant insurer of the service of process so made upon him, as the representative of the employer. At all events, by letter forwarded May 17, 1954, the insurer made known to the Deputy Director of the New Jersey Department of Labor assigned to the Workmen's Compensation Division that "[W]e went off the compensation on this risk on April 1, 1953, which was nine days before the alleged occurrence," and "We, therefore, will have no interest in the hearing of this case which is set down for May 26, 1954." The case was identified thus in the letter: "Insured—George Coat Company; Claimant—Rose Scaglione; Accident—4/10/53." And on that very day, plaintiff's attorney advised the partnership employer, by letter, that the insurer had denied policy coverage and that there would be a hearing of the petition in the Compensation Division at a given address in Paterson on May 26, 1954, when the plaintiff would proceed "notwithstanding the lack of appearance on behalf of the respondent."

Kosloy attended the hearing on the given day and "pursuant to information given by him" (this, according to testimony adduced from the sitting deputy director) the petition was amended to designate the respondents as "Joseph Pablo or Fablo, Benjamin Borowski and Joseph Deanin trading as George Coat Company," in lieu of "George Coat Company." And notations were made in the director's file

of "the name of the case, the amendment of the three persons trading as," and that "on May 26, 1954, Sidney Kosloy appeared on behalf of the respondent." The director then had before him the defendant insurer's letter of the prior May 17; and the proceeding was thereafter treated as a "no insurance case" which called for notice accordingly to the Attorney General should a later award of compensation remain unsatisfied.

The service made October 14, 1954 on Kosloy was of the petition as so amended. There was a final hearing and an award of compensation on April 22, 1955. The defendant insurer persisted in its denial of coverage. On November 17, 1955 it wrote to plaintiff's attorney that the employers' policy "expired on April 1, 1953, and was not renewed." This, notwithstanding advices transmitted by its local agency, Alfred C. Sinn, Inc., directly to the partnership, by letter of May 7, 1953, that the defendant insurer's policy coverage "expires (*sic*) on April 1, 1953," but "We have been covering you on binder since that date," and "effective May 17, 1953 your compensation coverage will no longer be effective," and "arrangements for other coverage" will be necessary.

The result was notice of the employers' default to the Attorney General and the indictment of the partners for failure to carry compensation insurance. Thereupon, May 18, 1956, the defendant insurer advised the Attorney General, in reply to his inquiry, that "[u]nknown to the Company there was a binder that had not been reported to [it] in the file of Alfred C. Sinn, Inc., on the date of April 10, 1953"; "[t]his binder was cancelled flat for the reason there was no payment of premium and because of the fact that the defendant did not operate after April 1, 1953"; "[u]nknown to [it] and without any notice, Rose Scaglione brought an action against the George Coat Company after the date of a bankruptcy or insolvency of that company"; "[t]he first knowledge [it, the defendant] had of such litigation was long after the award had been made in the compensation court," an award "made without [its] knowledge"; the "Company feels that under the decision in

* * * Belanowitz v. Travelers Ins. Co., 123 N. J. L. 574 and other cases, this award * * * does not affect [it] and we are exerting every means known to us to have such award set aside and the case retried"; "[s]ince the company was not operating on that date and was in fact in insolvency there could be no employment of any employee on the date in question." This admission eventuated May 31, 1956, in the dismissal of the indictment.

Acknowledging the subsistence of the binder coverage until its cancellation May 16, 1953 for default in the payment of the premium, the answer herein interposes these defenses: (a) plaintiff "failed to give to the defendant due notice of the proceedings involved in this case and proceeded to the trial of the issues well knowing that the defendant was entitled to such notice so as to proceed to a defense of the issues involved in the case"; (b) "the defendant was not properly brought into court" in the compensation action and "notice of such proceedings were withheld from the defendant until such time had elapsed that a timely appeal could not be taken to such proceedings"; and (c) the Compensation Division "did not acquire jurisdiction of the defendant in this case and the proceedings were had so as to deprive the defendant of a right to appear and defend its rights before the court": all this, notwithstanding its letter of May 17, 1954 to the Compensation Division, before the hearing of the petition.

I.

It was contended on the oral argument here that the insurer's refusal to defend the compensation proceeding was due to an honest belief that the policy had expired on April 1, 1953; that the insurance coverage was not discovered until after the entry of the compensation judgment, and thereafter unsuccessful attempts were made to persuade the plaintiff to reopen its judgment in the Division to permit a contest on the merits and so it became necessary to proceed with the attack on the jurisdiction of the Division;

and it would abandon its attack on the validity of the service of process were it afforded an opportunity to defend as to substantive right: and we concluded, 26 *N. J.* 225 (1958), to hold the appeal "without decision" in order to enable the defendant insurer to apply to the Division for the reopening of the judgment entered there and a "plenary trial of that case," the sole issue on the application to be "the good faith of the defendant in denying the existence of insurance coverage"; and if the deputy director "decides that issue in favor of the insurer, the judgment shall be reopened and the claim for compensation shall be fully tried, unless he concludes also that by reason of passage of time the plaintiff has been prejudiced so substantially because of loss of witnesses, records and the like, as to be unable to present her claim for compensation on the merits," the insurer, by its own concession, to pay reasonable counsel fees and expenses for all work done in this action, should the judgment be reopened.

The findings of fact and conclusions reported by Deputy Director Umberger, May 29, 1958, follow: on the motion to reopen the award and rule for judgment heard April 21, 1958 and May 16 following, the "attorney for the employer, who is also attorney for defendant" insurer, "called no witnesses and offered no evidence," but "relied solely on the affidavits annexed to his Notice of Motion"; the plaintiff "subpoenaed the carrier and its agent, A. C. Sinn Agency, together with certain books and records of each"; plaintiff demanded the appearance of certain witnesses, Franz, Sinn and Dowd, at the adjourned hearing held May 16, but these witnesses "were not present when called"; the insurer did not disclose until April 3, 1958 that "it had in force on the accident date, April 10, 1953, a general liability policy which had expired on April 1st, 1953, and which had been extended on binder coverage to May 16, 1953, nor did it disclose that in 1953 it had received notice of a possible claim by Rose Scaglione under this liability policy"; it is "significant that the compensation policy had similarly been extended on binder coverage," and no explanation "was

offered by the carrier to clarify the circumstances which made it aware of the existence of the liability policy but did not at the same time make it aware of the existence of the compensation policy."

The deputy director then goes on to report the insurer's claim, by affidavit, that its "first knowledge * * * of the compensation binder was in October or November 1955, when it received a letter from the Sinn Agency," enclosing a letter from plaintiff's attorney which referred to insurance coverage provided by Sinn as the defendant insurer's agent, and demanding payment of plaintiff's judgment for compensation, and that it "again reviewed the Sinn files and this time learned that the compensation policy had been extended beyond the date of accident"; and it is observed that the insurer "offers no explanation of why it was able to find the binder information then but had not been able to do so during the year and a half interval since 1954, when it wrote the Division." The director refers, as bearing upon motive, to the insurer's letter of November 17, 1955 denying coverage, in response to the letter forwarded by plaintiff's attorney the prior October 26 to the insurer's agent, Sinn, heretofore adverted to, "which the carrier now says led it to acquire knowledge of its faulty disclaimer," and comment is made on the insurer's persistence in denying that "it was on the risk when even, by its own admission, it had at last learned of the binder coverage." This continued denial of coverage, "in the face of [the insurer's] now admitted knowledge to the contrary," reveals, it is said, an "attitude toward this compensation claim" that is lacking in candor, "even if the truth had been acquired under the circumstances it claims."

The director found the record bare of proof that the insurer had "unsuccessfully attempted to persuade plaintiff to reopen the Division action, either by formal motion or otherwise." And he concluded, with good reason, that the insurer's disclosure on May 18, 1956, for the first time, of knowledge of the binder acquired in October or November 1955 was induced by the Attorney General's inquiry con-

cerning the "no insurance" report made by the Compensation Division.

And it was deduced that in its letter to the Attorney General of May 18, 1956 the insurer made these "several untrue statements affecting good faith:" (a) the insurer "claims the employee acted without knowledge or notice to the carrier," while the "fact is that the carrier notified the Division on May 17, 1954, that it had no interest in the case and would not appear," and "the carrier [in fact] had knowledge and notice"; (b) the insurer "says it first had knowledge of the litigation, 'long after the award,'" branded as an obvious untruth as shown in (a), and, moreover, when the letter of May 17, 1954 was written, "no hearing had yet been held and in view of their liability coverage, knowledge of which they admit they had at that time, it would have been reasonable to expect them to request an adjournment even for purposes of investigation or to enter into a defense under a non-waiver agreement, knowing they had previously been on the compensation risk and also carried the liability risk"; and (c) the insurer's "claim that the employer was not operating on April 10, 1953— the date of accident—is contrary to fact," it having been "definitely established by uncontroverted documentary proof (employer's check book, Exhibit P–4, May 16, 1958 hearing) and the testimony of Sidney Kosloy, Manager, that long after plaintiff's injury on April 10, 1953, the factory continued to work under its partnership owners until at least June 26, 1953," and that "on April 10, 1953, the employer was operating and distributed $2,602.62 in payroll to 30 or 40 employees for the week ending April 3, 1953," and "it was operating and paid out $828.74 on April 16, 1953 to 10 or 15 employees," "$284.29 on April 23, 1953 to about 6 employees"; that "there was a seasonal slack but on May 1, 1953, it paid out $174.25 to several employees and $171.93 was paid out on May 11, 1953 to about 6 employees," and the "last payroll for which a record has been found was on June 26, 1953, more than 2 months after the April 10th work injury."

The director inferred "from the failure of the carrier to move to reopen the Division Award from the time in October or November 1955, when it says it learned of the binder coverage, that the carrier did not intend voluntarily and in good faith to appear in the Division at all," an "assumption * * * borne out by the fact that on this referral to the Division by this Court, the carrier continues to refuse to enter its general appearance."

Holding that it had the burden of showing good faith, the director reported that "with a single purpose" the insurer "prevented [the director], as the fact finder, from getting at the substantial volume of office data from its own files and the files of its agent, Sinn Agency, which plaintiff had subpoenaed"; and "[f]rom its refusal to make this material available and from its refusal to offer the witnesses to explain," the inference is fairly permissible, and he so concluded, that "had this evidence been received, it would not have shown the claimed good faith, but would rather have supported the contrary thesis."

And these findings of fact were made: on April 13, 1953, the employer paid the Sinn Agency $151.52 "on account of insurance premiums," and "at least as of that date, 3 days after the date of the accident, the carrier had imputed knowledge of the fact that the partnership employer was functioning," and "[a]ny representations to the contrary are untrue in fact"; service of the "original and amended claim petition was in fact made on Sidney Kosloy as shown by the returns of service" and Kosloy "transmitted the same in due course to the A. C. Sinn Agency, agent of the carrier"; the insurer "has completely failed to 'submit their proofs,' as required" by the opinion of this court, "and failed to show that it 'acted in good faith and without deception * * *' "; the proofs adduced before the director make evident that "at least from January 22, 1953" plaintiff "was an employee of George Coat Co., and * * * she continued as such on April 10, 1953, when she sustained a compensable work injury as set out in the award previously made"; the "records of the partnership employer were turned

over to the Trustee in Bankruptcy of the corporation which took over the partnership"; the "only known record of the partnership employer is a quantity of check stubs, marked Exhibit P-4, which were examined in detail" and "this exhibit does not disclose the name or address or any other means of identifying co-employees of plaintiff as of the date of the accident"; nor was Kosloy "able to furnish such information from his own knowledge." And there was a finding of fact that "by reason of passage of time, plaintiff would be substantially prejudiced if she were now to be obliged to re-litigate her claim for compensation in a plenary way, because of loss of witnesses, records and other data which would be required," and "it would be substantially and prejudicially unreasonable to require the plaintiff at this late date, more than 5 years after her injury at work, to have to meet the issue of whether or not on the date of accident she was in the employ of the insured," and "whether the accident arose out of and in the course of her employment and the nature and extent of her disability."

The ultimate conclusion was that the insurer "has given practically no assistance and considerable obstruction to inquiries addressed to the issue of its good faith"; "they have withheld documentary evidence and necessary witnesses when good faith would seem to urge them to volunteer"; "they refused even at the hearing to make a general appearance"; and its actions and conduct at the hearings before the director did not square with its pretensions to good faith; but that even though the insurer had proved good faith "in the first instance," it is an "inescapable conclusion" that the "consequences of the intervening period since the work injury in April 1953, loss of witnesses, records and the like, have substantially prejudiced the plaintiff and she should not now have to again" relitigate her claim, and that the "disclaimer by the carrier was a decision made with complete indifference to the needs of the plaintiff."

The insurer now affirms that on this inquiry its attorney, "representing the defendants," made known that should the "compensation bureau reopen the case the defendant would

abandon its attack on the validity of service and enter unqualifiedly into a defense of the compensation petition"; that "the defendants have acted in good faith in denying insurance coverage"; that there is "no proof of any prejudice to the plaintiff because of the loss of records or witnesses," and this latter finding of prejudice "should be disregarded" and the appeal considered on its merits.

The insistence is that there "was not one word of proof that any record desired by the plaintiff was not available"; and it is said that "As a matter of fact they actually produced a check book of the defendants" which, "strangely enough, * * * showed that the last entry showing any direct payment to the plaintiff was on January 22, 1953 * * *."

But the probe into the insurer's good faith concerned not the validity of the claim for compensation, but rather "the good faith of the defendant in denying the existence of insurance coverage"; and the issue thus made must be resolved against the insurer. As late as May 18, 1956, in a letter to the Attorney General of New Jersey, the insurer acknowledged the issuance of the binder but denied notice and knowledge of the institution of plaintiff's compensation proceeding until "long after the award had been made in the compensation court." And on November 17, 1955, by letter to plaintiff's attorney, the insurer denied coverage, even though it then concededly knew (assuming, *arguendo,* prior ignorance) of the binder coverage issued by its own agent. And on May 17, 1954 the insurer advised the Compensation Division, by letter, that insurance coverage "on this risk [Scaglione Accident—4/10/53]" had terminated April 1, 1953, "which was nine days before the alleged occurrence," and "We, therefore, will have no interest in the hearing of this case which is set down for May 26, 1954." The insurer did not then deny the validity of the service of process on the insured; it denied coverage, and it persisted in the denial until long after its knowledge of the binder, as now revealed, became an unquestionable fact. The insurer did not bring to the inquiry before the deputy director,

pursuant to the mandate of this court, the candor and frankness characteristic of the resolve to reveal the truth; and so it must abide the clear and compelling adverse inference.

And in this context the insurer argues here that "Had proceedings been instituted so as to acquire jurisdiction of the partners they would have communicated with the agent and the insurance company would have learned of the binder and a defense would have been available to the defendant company." The professed ignorance of the binder coverage is laid to the failure of its own agent; and yet it precluded full inquiry into the fact.

## II.

It is nevertheless insisted that (a) there was a denial of constitutional due process by the overruling of the insurer's motion to dismiss and for judgment, in that "the members of the partnership did not know about the injury in the case and were never served with any notice of hearing and were never served with a petition for compensation," and "they made, therefore, no appearance in the cause and judgment went against them without their knowledge," and the insurer "was never served in the pending action and had no knowledge of the award until the present suit was instituted long after the time for appeal had expired"; and (b) there was error in the holding that "service upon a former manager of a partnership gave jurisdiction to the court below against the partners so as to bind" the defendant insurer.

But the insurer, aware of the pendency of the proceeding for compensation against the partnership, denied forthwith the affirmed coverage under its policy and, before the event, elected to renounce all "interest in the hearing of [the] case," and it adhered to that election throughout, even after receipt of the attorney's letter of October 26, 1955. Due service of process upon the partnership was then of no concern to the insurer. It disclaimed all coverage; it would

not defend the action or pay the award even if jurisdiction of the partnership had been acquired by lawful service of process. And, as we have seen, counsel to the contrary notwithstanding, the insurer was apprized of the award before the commencement of the instant suit, as early as the latter part of October 1955, at the very least.

There can be no doubt that the partnership knew from the outset of the service of the petition for compensation upon Kosloy as the agent of the firm, the conceptual, ideal person, considered in law for certain purposes an artificial person, or being, a jural entity separate and distinct from the individuals composing it, *Curtis v. Hollingshead,* 14 *N. J. L.* 402 (*Sup. Ct.* 1834); *X-L Liquors, Inc., v. Taylor,* 17 *N. J.* 444 (1955), and that notice of the service was given to the insurer by the partnership through Kosloy. As Judge Davidson said in the Law Division: "[I]t is inconceivable * * * that [Kosloy] would be served with a paper and not tell his father-in-law [the partner Deanin] about it." And it is equally inconceivable that Kosloy did not make the service known to all three partners. Indeed, under the proved facts and circumstances, in particular the course of conduct throughout of the parties in interest and Kosloy's stated appearance before the Division, these are irresistible implications.

And there was due service of process on the partnership by the service on Kosloy. The partnership did not challenge the judgment as void for want of jurisdiction. Nor did the insurer refuse to defend or to satisfy the award on the ground of the want of due process. It is said in argument that "After dissolution service on partners who are to be bound must be made personally upon them," and "Service on one partner even will not bind the others"; and "This being so," it is inquired, "how can it be said that [the defendant insurer] has been properly served with due process." "There was no means," it is again insisted, "by which it could in the usual course of events have known of the pending litigation"; and "there was nothing in the relationships between the parties that would require notice of

dissolution." Here again, it is repeated that the "partners were completely unaware of the accident and injury and knew nothing about the claim," a false hypothesis, and "No one of them was served and no one of them knew that litigation was ever pending"; and the attorneys "had knowledge of the fact that the partnership had been succeeded by a corporation and that Sidney Kosloy was an officer [secretary and treasurer] of such corporation," seemingly a suggestion that Kosloy bore no managerial relation to the partnership, an obvious *non sequitur*.

On dissolution the partnership is not terminated, but continues until the winding up of partnership affairs is completed, and for that purpose alone. *R. S.* 42:1–30. The Uniform Partnership Law so provides. 7 *U. L. A.* § 30. And the winding-up process includes the satisfaction of the partnership obligations and the bringing of legal actions to that end. Generally, dissolution "operates only with respect to future transactions; as to everything past the partnership continues until all pre-existing matters are terminated"; and there is no reason, therefore, why a "statute authorizing a judgment against a partnership by service upon one partner [the rule at common law calls for service on all the partners] should not be just as effective and applicable during the period subsequent to dissolution but prior to termination of the partnership as it is during the period before dissolution." *Cotten v. Perishable Air Conditioners,* 18 *Cal. 2d* 575, 116 *P. 2d* 603, 136 *A. L. R.* 1068 (*Sup. Ct.* 1941). It suffices for present purposes that such judgment is enforceable against the partnership estate; to resolve the issue here we need not go further and determine the effect of the judgment on the personal and separate estate of a partner not served. The partners are each under a duty to liquidate the partnership affairs, "which in turn includes in general the performance of existing contracts, the collection of debts or claims due the firm, and the payment of firm debts," citing 47 *C. J.* 1122, § 791; 68 *C. J. S. Partnership* § 351. *McKinley v. Long,* 227 *Ind.* 639, 88 *N. E. 2d* 382, 23 *A. L. R. 2d* 577 (*Sup. Ct.* 1949). Such

is not new doctrine; it is of the very essence of the relationship. *Gray v. Green,* 142 *N. Y.* 316, 37 *N. E.* 124 (*Ct. App.* 1894).

■ As to process, *R. R.* 4:4–4(*e*) provides that service shall be made "[u]pon a partnership, by serving, in the manner prescribed by paragraph (a), a partner, a managing or general agent or an officer; * * *"; and Kosloy was plainly a managing or general agent of the partnership and remained such in fact during the period of liquidation. He continued in that capacity after dissolution by the acquiescence and consent of the partners. One of the partners, Borowski, so testified—Kosloy was the "manager and he controlled the business"; and there is no credible evidence *contra.* It was he who handled the compensation proceeding in behalf of the partners. There was no public notice of dissolution or that Kosloy's status had changed or that his authority had been revoked. See *Rule* 4(*d*)(3), (7) of *Federal Rules of Civil Procedure,* 28 *U. S. C. A.;* 2 *Moore's Federal Practice,* §§ 4.22, 4.24. See *United Mine Workers of America v. Coronado Coal Co.,* 259 *U. S.* 344, 42 *S. Ct.* 570, 66 *L. Ed.* 975 (1921); *Esteve Bros. & Co. v. Harrell,* 272 *F.* 382 (5 *Cir.* 1921); *Operative Plasterers' and Cement Finishers' International Ass'n of United States and Canada v. Case,* 68 *App. D. C.* 43, 93 *F.* 2d 56 (*App. D. C.* 1937).

■ Here, the dissolution was voluntary; and it seems to be conceded that the partnership eventually became insolvent and direct action against the insurer is now maintainable under the statute. On June 23, 1953 the partnership operation under the common name of "George Coat Co." was transferred to a corporation newly formed, May 28, 1953, for the same objects and purposes, under the name of "George Coat Company, Inc."; the transfer included the whole of the plant premises; the partners with the lessor's consent assigned the lease for the premises to the corporation, but each partner remained individually liable on the instrument; Kosloy became secretary and treasurer of the corporation, and he, with Mary Borowski, the wife of one of the partners, individually guaranteed performance of

the lease; and Kosloy continued to exercise the selfsame managerial function as was his under the partnership. Mary Borowski became an officer of the corporation, ostensibly in the place and stead of her husband. It was a continuance of the partnership business under the corporate form and, while it may well be that the relative interests were not altogether the same (it is suggested that the partners were mere "employees" of the corporation), it goes without saying that the transfer was subject to plaintiff's claim for compensation, which was the ultimate responsibility of the defendant insurer, and the partnership continued in existence for the liquidation of the obligation with Kosloy bearing to the collective entity and its members the same relation to this end as had been his before. Such is a compelling inference of fact.

Neither the partnership nor the insurer moved in the Compensation Division for annulment of the award as void for failure of due process or for a new trial. The insurer elected to disclaim insurance coverage; and, that failing, it cannot now demand a reopening of the award and a trial of the issue on the merits. The Compensation Division had jurisdiction of the person and the subject matter; and on well settled principles the award is *res judicata*. While such a finding may be reopened for good cause, on timely application, there is no occasion at law or in equity for taking that course here; quite the contrary, for the stated considerations. And we concur in the finding of the deputy director that plaintiff would be greatly prejudiced were she now called upon to relitigate the issue on the merits.

█ The insurer's ultimate liability for the payment of the award is fixed by statute, *R. S.* 34:15–82; 34:15–83; 34:15–84, as amended by *L.* 1953, *c.* 33; 34:15–86; and under the doctrine of *res judicata* a judgment may be conclusive against one who is liable over to the judgment debtor in respect to the cause of action adjudicated, or one derivatively responsible to the judgment creditor, at least where there has been notice to the third party of the prior action and an opportunity to defend afforded. The principle

applies to indemnitors, sureties and guarantors. *West Jersey & Seashore R. Co. v. Atlantic City Electric Co.*, 107 *N. J. Eq.* 457 *(Ch.* 1931). Compare *Ludy v. Larsen*, 78 *N. J. Eq.* 237 *(E. & A.* 1911), Pitney, C. See collection of cases in 30 *Am. Jur., Judgments,* §§ 415, 417 *et seq.* And the statute, *R. S.* 34:15–85, ordains that every such contract of insurance shall provide that, as between the employer and the insurance carrier, "the notice to or knowledge of the occurrence of the injury on the part of the employer shall be deemed notice or knowledge, as the case may be, on the part of the insurance carrier"; and that "jurisdiction of the employer shall, for the purpose of [the] article, be jurisdiction of the insurance carrier," and "the insurance carrier shall in all things be bound by and subject to the orders, findings, decisions or awards rendered against the employer for the payment of compensation."

Kosloy, called as a witness by the insurer, testified that he learned of the plaintiff's accident, a fall on a stairway of the partnership premises, on the day of its occurrence, or the day after, and that "having knowledge of the accident, as a routine matter [he] did report it"; he was in charge of "insurance coverage" for the partnership and knew of the defendant insurer's policy, and he "would have filled out a report" to the insurer "as a routine procedure."

The insurer refused to defend the compensation action as it had contracted to do, on the faulty assumption of a prior termination of the policy coverage; it deliberately chose that course and pursued it to the very end; and on the plainest principles of justice the rule of estoppel by a prior adjudication imperatively applies.

The judgment of the Appellate Division is accordingly reversed; and the judgment of the Law Division of the Superior Court is affirmed.

*For reversal*—Chief Justice WEINTRAUB, and Justices HEHER, WACHENFELD, BURLING, JACOBS, FRANCIS and PROCTOR—7.

*For affirmance*—None.