**In re STANLEY–SOUTHWEST INVESTMENTS, INC. d/b/a Stanley Travel, Debtor.**

**STANLEY–SOUTHWEST INVESTMENTS, INC. d/b/a Stanley Travel, Plaintiff,**

v.

**COLONIAL FROST BANK, N.A., Defendant.**

Bankruptcy No. 5–86–00391.
Adv. No. 5–86–0246.

United States Bankruptcy Court, W.D. Texas, San Antonio Division.

Dec. 31, 1988.

Garvin Stryker, San Antonio, Tex., for debtor.

Patrick Pape, San Antonio, Tex., for defendant.

## JUDGMENT AND ORDER

LEIF M. CLARK, Bankruptcy Judge.

At San Antonio, Texas, came on for trial the foregoing cause. Upon consideration of the evidence and the arguments of counsel, the court enters this judgment and order. The following represents this court's findings and conclusions with respect thereto.

On May 15, 1984, Larry J. Stanley ("Stanley") and his closely held company, Stanley–Southwest Investments, Inc. ("Stanley–Southwest"), formed a general partnership known as "Stanley Travel." On June 6, 1984, Stanley filed an assumed name certificate for Stanley Travel, indicating that the entity was a general partnership. Though not reflecting who the partners were, the certificate did correctly reflect the partnership's address. On December 26, 1984, Stanley Travel borrowed $25,000.00 unsecured for furniture and equipment (the "Note") from Colonial Frost Bank ("the Bank").

On March 1, 1986, Stanley retired from the partnership by causing his company, Stanley–Southwest, which then owned 90% of the partnership, to "purchase" his 10% interest in the partnership for $20,000.[1] Two weeks later, on March 14, 1986, Stanley–Southwest, d/b/a Stanley Travel, filed this bankruptcy.

Both prior to and following the bankruptcy filing, Stanley Travel continued to make its regular monthly note payments of $1165.19 to Colonial Frost. Three payments totalling $3,495.57 were paid prior to the filing, and $4,660.76 was paid post-petition. The debtor-in-possession, Stanley–Southwest, now seeks to recover all of these sums as preferential transfers under Sections 547, 549, and 550 of the Bankruptcy Code. 11 U.S.C. §§ 547, 549, 550.

The Bank argues that the plaintiff has no standing to recover these sums because the Bank made its loan to the partnership, not to Stanley–Southwest. What is more, the Bank contends it was deceived by the assumed name certificate into thinking that Stanley–Southwest had nothing to do with this partnership.[2] It urges that it could be liable only to Larry Stanley or Stanley Travel for preferences received, but not to Stanley–Southwest. The Bank finally urges that this court does not have jurisdiction over this proceeding.

This court has the jurisdiction to enter a final, appealable judgment in preference litigation. 28 U.S.C. § 157(b). As a preliminary matter, the court also has the power (indeed the duty) to resolve issues of standing. *U.S. v. One 18th Century Colombian Monstrance*, 797 F.2d 1370, 1374 (5th Cir. 1986).[3] All federal courts are courts of "limited jurisdiction," i.e., they hear only actual cases and controversies which are truly ripe for consideration and do not enter merely advisory decisions. *Warth v. Seldin*, 422 U.S. 490, 518, 95 S.Ct. 2197, 2215, 45 L.Ed.2d 343 (1975); *U.S. v. One 18th Century Colombian Monstrance*, 797 F.2d at 1375.

The Bank's standing argument has some merit. A debtor-in-possession, exercising the powers of a trustee under Section 547 may only recover transfers of the *debtor's* interest in property. 11 U.S.C. § 547(b)

---

1. Not at issue in this proceeding is the propriety of this transaction under any other provisions of the Bankruptcy Code.

2. The theory of the Bank is that it reasonably relied on the appearance that Stanley Travel was and continued to be a partnership and that only that partnership can avoid the payments it received. The entity that filed bankruptcy was not the partnership but one of the partners, Stanley–Southwest. Therefore, goes the argument, the debtor, by holding itself out as a partnership, is somehow estopped from avoiding the transfers of its personal property.

3. Standing ... is literally a threshold question for entry into a federal court, limiting the exercise of its jurisdiction, and the court must consider the standing of any party even if the issue has not been raised by the parties to the action [citing *Juidice v. Vail*, 430 U.S. 327, 331–32, 97 S.Ct. 1211, 1215, 51 L.Ed.2d 376 (1977) and *Jenkins v. McKeithen*, 395 U.S. 411, 421, 89 S.Ct. 1843, 1848, 23 L.Ed.2d 404 (1969) ].
*Id.*

("... the trustee may avoid any transfer of an interest *of the debtor* in property"). Recoveries under Section 549 are limited to transfers of property of the estate. 11 U.S.C. § 549(a) ("the trustee may avoid a transfer of property of the estate that occurs after the commencement of the case ..."). The question here is whether the transfers in question came from the partnership, Stanley Travel, or from the debtor, doing business as Stanley Travel. *In re Caudy Custom Builders, Inc.*, 31 B.R. 6, 8–9 (Bankr.D.S.C.1983) (a transfer of partnership property cannot be avoided by the trustee of a partner). If the property transferred to the Bank was that of the partnership, the plaintiff's case falls for failure to prove a transfer either of the debtor's (i.e., Stanley–Southwest) interest in property or of property of the estate (i.e., Stanley–Southwest, debtor-in-possession). *Id.* If the property transferred is that of the debtor doing business as Stanley Travel, however, the transfer may be avoided under either Section 547(b) or 549.

Stanley Travel was undeniably a partnership at least until March 1, 1986. When the debtor, Stanley–Southwest, bought out Stanley's 10% interest in Stanley Travel, it was left as the only remaining "partner." The minimum requirement for a partnership is that it have at least two partners. TUPA, § 6(1); *State v. Houston Lighting & Power Co.*, 609 S.W.2d 263, 267 (Tex. App.—Corpus Christi 1980, writ ref'd n.r. e.). The "buyout" thus should have worked a dissolution of the partnership. Tex.Rev.Civ.Stat.Ann., art. 6132b, § 29 (West pamphl. ed. 1988) (hereinafter "Texas Uniform Partnership Act" or "TUPA") ("dissolution of a partnership is the change in the relation of the partners caused by any partner ceasing to associate in the carrying on as distinguished from the winding up of the business"); *Kelly v. Kelly*, 411 S.W.2d 953, (Tex.Civ.App.—Houston [1st Dist.] 1967, writ ref'd n.r.e.) (generally sale of partnership interest by one of two partners and that partner's withdrawal from participation in the business dissolves the partnership).

The partnership agreement permits the continuation of the partnership despite the retirement of one partner. Plaintiff's Exhibit 1. Under Texas law, the "partnership" could conceivably have continued its existence even after Larry Stanley's retirement without a dissolution being effected as a matter of law. *See Park Cities Corp. v. Byrd*, 534 S.W.2d 668, 672 (Tex.1976) (partnership agreement controls over Uniform Partnership Act); TUPA, § 1, Comment 1; *cf. Gevinson v. Manhattan Constr. Co. of Oklahoma*, 420 S.W.2d 486 (Tex.Civ.App.—Ft.Worth 1967), *rev'd on other grounds*, 449 S.W.2d 958 (1969) (pre-TUPA, a single individual could not own a partnership). Here, though, the parties intended to terminate the partnership, as evidenced by (1) the final partnership tax return, closing the tax year on February 28, 1986 (Plaintiff's Exhibit 3) and (2) the debtor's Schedule B–2, which fail to reflect any continuing interest in Stanley Travel as a partnership (Plaintiff's Exhibit 6). The voluntary desire of a partner to dissolve a partnership is honored under the Uniform Partnership Act. TUPA, § 31(1)(b).

Dissolution does not automatically terminate a partnership. TUPA, § 30. To the contrary, there are three distinct stages in the process of discontinuing a partnership's existence—dissolution, the winding up of partnership affairs, and termination. *Bader v. Cox*, 701 S.W.2d 677, 681 (Tex.App.—Dallas 1985, writ ref'd n.r.e.). During the period of dissolution, the partnership's internal and external relations are governed by Sections 33–43 of TUPA. According to Section 40(a) of TUPA, the assets of the partnership available for satisfaction of partnership obligations upon the conclusion of the winding-up process are (I) the partnership property and (II) the contributions of partners necessary for the payment of all the liabilities of the partnership (specified in subsection (b) of Section 40). TUPA, § 40(a). Partnership property, in turn, is defined in Section 8 of TUPA as "all property originally brought into the partnership stock or subsequently acquired by purchase or otherwise, on account of the partnership ..." TUPA, § 8(1). Further, unless a contrary intention appears, "prop-

erty acquired with partnership funds is partnership property." TUPA, § 8(2).

Texas is emphatically an "entity theory" state when it comes to partnerships. *Jacox v. Cobb*, 659 S.W.2d 743, 745 (Tex.App.— Tyler 1983, no writ); TUPA, § 1, Comment 1.[4] The continuation of the "entity" after dissolution serves to facilitate the winding-up process. *See* TUPA, § 30 ("on dissolution the partnership is not terminated, but continues *until the winding up of partnership affairs* is completed"). The winding-up process is conducted primarily for the benefit not of the partnership's creditors but of its respective partners. Not until the partnership's assets have been applied to its obligations can it be known whether remaining partners will have to "ante up" additional capital to make up the difference or will instead receive the remaining assets as their profits. *See* TUPA, § 40.

It is true that one of the important aspects of the winding-up process is to pay off existing obligations. *See, e.g., Hentges v. Wolff,* 61 N.W.2d 748, 240 Minn. 517 (1953); *Scaglione v. St. Paul–Mercury Indem. Co.,* 145 A.2d 297, 28 N.J. 88 (1958). That function, however, merely serves the larger purpose of winding-up, mainly, to determine the profits or losses to be shared by the partners. *See, e.g., Park Cities Corp. v. Byrd,* 534 S.W.2d 668, 672–73 (Tex.1976). It is not necessary to continue the legal existence of the partnership to protect creditors' rights, because Section 41(2) of TUPA provides that claims of third party creditors will continue to be good against not only the partners but also the enterprise which might be continued as a new partnership or as a sole proprietorship, notwithstanding the dissolution of the partnership.[5]

It is pointless, therefore, to entertain the Bank's arguments that it relied on the existence of the partnership when it accepted payments from Stanley Travel. Those cases which protect a creditor that does business with what it thinks is a partnership do so to preserve the creditor's claim against the partnership's assets and the partners themselves. *See, e.g., Boyd v. Leasing Associates, Inc.,* 516 S.W.2d 485, 488 (Tex.Civ.App.—Houston [1st Dist.] 1974, writ ref'd n.r.e.); *see* TUPA, § 15. The Bank here continues to enjoy its claim against Stanley Travel's assets, be they the assets of the partnership or the assets of the successor, Stanley–Southwest. Bankruptcy preference law does not alter these rights. Instead, it focuses on the role of a trustee acting on behalf of the estate of a given debtor to achieve a redistribution of estate property that will hopefully yield a more equitable sharing of losses suffered by all the estate's creditors. M. Bienenstock, *Bankruptcy Reorganization,* p. 345 (PLI, 1987). Theories of waiver, estoppel, and detrimental reliance are simply inapposite.

■ Such theories are invalid defenses against a preference action anyway. The only affirmative defenses available to preference suits are those set out in Section 547(c). 11 U.S.C. § 547(c); *see In re Day*

---

4. The commentary to the Texas Uniform Partnership Act (written by Alan Bromberg) notes that—

> The Uniform Partnership Act leans heavily toward the entity idea, which accords with business usage. The Texas version goes even further. The only significant aggregate feature of the Act is the joint and several liability of partners (section 15). Even this is phrased as liability for the obligations "of the partnership." In contrast, entity notions permeate the Act, particularly four critical areas.
> (1) *Property* ... The interest in the partnership is the partner's individual property, quite independent of specific partnership property.... On the other hand, his rights in specific partnership property are wholly subordi-

nated to the rights of the partnership entity as owner of the property....
(2) *Creditors' Rights.* Partnership creditors are given priority in partnership assets, and individual creditors in individual assets (§§ 40(h), (i), 36(4))....
*Id.*

5. The section reads as follows, in pertinent part:
(2) When all but one partner retire and assign ... their rights in partnership property to the remaining partner, who continues the business without liquidation of partnership affairs, either alone or with others, creditors of the dissolved partnership are also creditors of the person or partnership so continuing the business.
TUPA, § 41.

*Communications, Inc.,* 70 B.R. 904, 910 (Bankr.E.D.N.C.1987). None of these defenses were asserted by the Bank in this action, so it is pointless to evaluate whether any of those defenses might have been available. *See In re Fasano/Harriss Pie Co.,* 71 B.R. 287 (Bankr.W.D.Mich.1987).[6]

It is true that Section 40(a)(II) of TUPA includes as a partnership asset the capital contributions owed by partners needed to pay off the partnership's obligations. TUPA, § 40(a)(II). The section sets out the rules for settling accounts "between the partners after dissolution." Once accounts have been settled, and winding up has been completed, the partnership is terminated. *See* TUPA, § 30. Sections 15 and 41, not Section 40, control the relationship of partners and creditors after termination. To the extent a partner pays a partnership claim after termination of the partnership, it is paying off a *personal* liability created by Section 15 of TUPA. TUPA, § 15 ("All partners are liable jointly and severally for all debts and obligations of the partnership . . ."). It is no longer satisfying a partnership capital account obligation. *Cf.* TUPA, §§ 18(a), 40(d). What is transferred after termination, then, is not partnership property (i.e., capital contributions under Section 40(a)(II)), but partner property (i.e., satisfaction of joint and several liability under Section 15).

In this case, Larry Stanley retired from the partnership by having his company, Stanley–Southwest, buy him out. The Bank at that point enjoyed a claim against the assets both of Stanley Travel, the partnership, and of Stanley–Southwest, doing business as Stanley Travel. Meanwhile, the need for winding-up was obviated by Larry Stanley's receipt of $20,000 for his 10% interest in the partnership from Stanley–Southwest. He waived any further rights to accountings or the like upon that assignment. *Kelly v. Kelly,* 411 S.W.2d 953, 955 (Tex.Civ.App.—Houston [1st Dist.] 1967, writ ref'd n.r.e.). There was thus no further winding up to be done. The sole

remaining partner had assumed all the assets and liabilities of the entity, without further obligation to Larry Stanley. The partnership was thus effectively terminated at the same time as it was dissolved, with the three stages collapsed into an instantaneous moment. In this case, therefore, March 1, 1986, the moment of dissolution, was also the moment of termination of the partnership.

Following this analysis, transfers prior to the dissolution (and termination) of the Stanley Travel partnership are transfers of partnership property, while transfers after that point in time are of Stanley–Southwest's interest in property. Stanley Travel made regular payments of $1165.19 in December and January of 1986, prior to the dissolution. Neither of these payments can be avoided by the plaintiff, as they represent transfers of partnership property. *See In re Caudy Custom Builders, Inc.,* 31 B.R. at 9.

It is not necessary to determine from what source Stanley Travel *qua* partnership acquired the funds with which to pay the Bank. Even though Stanley–Southwest made numerous advances to the partnership within ninety days of the filing, those advances are not preferences directly to the Bank as the initial transferee. It is true that, as a general principle, such preferential transfers could be recovered from the Bank to the extent that the Bank is shown to be a mediate or immediate transferee of the initial transferee, the partnership. 11 U.S.C. § 550(a)(2). Here, though, all the evidence indicates that the Bank falls within the exception carved out in Section 550 for those subsequent transferees who take for value (including the payment of an antecedent debt), in good faith, and without knowledge of the voidability of the transfer. 11 U.S.C. § 550(b)(1), (2). The Bank certainly did not know that Stanley–Southwest was a partner in Stanley Travel prior to the bankruptcy filing. The payment checks were written on an account simply styled "Stanley Travel" and

---

**6.** The Bank will not be foreclosed, however, from asserting the reliance-on-the-continuing-existence-of-a-partnership argument in a *state* *court* action against Larry Stanley. *See Boyd v. Leasing Associates, Inc., supra;* TUPA, § 15.

came in fairly regularly. The partnership agreement was of course not a matter of public record and the assumed name certificate did not reflect Stanley–Southwest as a partner. The Bank's failure to conduct a searching inquiry into the composition of the partnership does not undercut its good faith in receiving the payments. Thus, the December and January payments cannot be avoided even though made using funds received from Stanley–Southwest within the preference period. 11 U.S.C. § 550(b)(2).

■ The last Stanley–Southwest advance made pre-petition to the Stanley Travel business was on February 14, 1986. The next payment to the Bank, though due in February, was made March 3rd, just two days after the buyout. Even though the source of this payment was the Stanley Travel checking account, to which the receipts of the partnership (including advances by its partner, Stanley–Southwest) were deposited, the *termination* (as opposed to the mere dissolution) of the partnership changed the character of these funds from partnership assets to assets of Stanley–Southwest, d/b/a Stanley Travel. The March 3, 1986 payment was thus a transfer of the debtor's interest in property, qualifying it for avoidance under Section 547(b).[7]

■ The same analysis confirms that the post-petition payments were made by Stanley–Southwest, d/b/a Stanley Travel. Therefore, these transfers are transfers of property of the estate avoidable under Section 549.[8]

## CONCLUSION

In view of the foregoing, judgment is entered in favor of Plaintiff pursuant to Sections 549(a) and 550(a) for those funds transferred postpetition, in the total amount of $4,660.76, and for the March 3,

---

**7.** There is no dispute between the parties that the transfers in question satisfy the remaining elements of Section 547(b) and in any event, the evidence supports such a finding.

**8.** Section 549 provides in pertinent part as follows—

(a) ... the trustee may avoid a transfer of property of the estate—

1986 payment of $1165.19 under Section 547(b). Insofar as plaintiff's claims to the remaining prepetition transfers are concerned, judgment is denied.

So ORDERED.

(1) that occurs after the commencement of the case; and

(2) ...

(B) that is not authorized under this title or by the court.

11 U.S.C. § 549(a).