SYLLABUS

(This syllabus is not part of the opinion of the Court. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Supreme Court. Please note that, in the interest of brevity, portions of any opinion may not have been summarized).

**Mortgage Grader, Inc. v. Ward & Olivo, L.L.P.** (A-53-14) (075310)

**Argued February 1, 2016 -- Decided June 23, 2016**

**FERNANDEZ-VINA, J., writing for a majority of the Court.**

In this appeal, the Court considers whether a law firm practicing as a limited liability partnership ("LLP") failed to maintain professional malpractice insurance to cover claims against it, and, if so, whether that failure may cause the revocation of the firm's LLP status, rendering innocent partners personally liable. To inform that determination, the Court also considers when a law-firm LLP incurs its obligation to a client under the Uniform Partnership Act.

In July 2009, Mortgage Grader hired Olivo of Ward & Olivo ("W&O") to pursue claims of patent infringement. Mortgage Grader entered into settlement agreements, which eventually would give rise to allegations of legal malpractice.

On June 30, 2011, W&O dissolved and entered into its windup period. W&O continued to exist as a partnership for the sole purpose of collecting outstanding legal fees and paying taxes. W&O's claims-made malpractice insurance policy ran through August 8, 2011. W&O did not purchase a "tail policy." In October 2012, Mortgage Grader filed a complaint against W&O, Olivo, and Ward alleging legal malpractice by Olivo in connection with the settlement agreements. Mortgage Grader filed an affidavit of merit ("AOM") pursuant to N.J.S.A. 2A:53A-27 to support its malpractice claims, and served the AOM on Olivo and W&O, but failed to serve Ward. Ward filed an answer and subsequently moved to dismiss. Ward maintained that W&O's liability shield remained intact, and therefore he could not be held vicariously liable for Olivo's alleged negligence. Ward also claimed that Mortgage Grader had not served him with an AOM as required by statute.

The motion court denied Ward's motion to dismiss. The court first determined that Mortgage Grader had failed to comply with the statutory requirement to serve an AOM on each defendant named in the complaint, and rejected its substantial compliance argument. However, the court also determined that W&O failed to maintain the requisite insurance pursuant to Rule 1:21-1C, which provides that a law firm organized as an LLP must purchase malpractice insurance. As a result, W&O's liability shield lapsed, relegating W&O to a general partnership (GP). Thus, the motion court concluded that Ward could be held vicariously liable for Olivo's alleged legal malpractice.

The Appellate Division reversed. 438 N.J. Super. 202 (App. Div. 2014). The panel held that the trial court erred in converting W&O from an LLP to a GP when it failed to purchase a tail insurance policy, and concluded that Ward was shielded from personal liability as a result. Furthermore, the Appellate Division determined that Mortgage Grader failed to substantially comply with the AOM Statute because Mortgage Grader took no deliberate steps to comply, thus providing no reasonable notice of the claim to Ward, whose personal assets would be at risk.

The Court granted Mortgage Grader's motion for leave to appeal. 221 N.J. 216 (2015).

**HELD**: The requirement in Rule 1:21-1C(a)(3) that law firms organized as LLPs maintain malpractice insurance does not extend to the firm's windup period when the law firm has ceased performing legal services, and does not require purchase of tail insurance. In addition, the violation of Rule 1:21-1C(a)(3) does not result in automatic conversion of a law firm organized as an LLP into a GP. As a result, Mortgage Grader had no vicarious liability claim against Ward.

1. Rule 1:21-1C permits attorneys to organize as LLPs, which establishes a shield from personal liability for LLP partners. Rule 1:21-1C conditions practice by law-firm LLPs on compliance with partnership law, adherence to the rules of professional responsibility, and maintenance of malpractice insurance. Specifically, section (a) provides that "[a]ttorneys may engage in the practice of law as limited liability partnerships" provided that "[t]he limited

liability partnership shall obtain and maintain in good standing one or more policies of lawyers' professional liability insurance which shall insure the limited liability partnership against liability imposed upon it by law for damages resulting from any claim made against the limited liability partnership by its clients arising out of the performance of professional services by attorneys employed by the limited liability partnership in their capacity as attorneys." R. 1:21-1C(a)(3) (emphasis added). The plain language of the Rule ties the mandate to carry malpractice insurance to damages from the performance of "professional services." There is no indication that the administrative activities characterizing a windup are included within that term. (pp. 10-12)

2. In addition to the plain language of the insurance mandate, subsection (a)(1) of Rule 1:21-1C instructs that "[a]ll provisions of the Uniform Partnership Act ("UPA"), N.J.S.A. 42:1A-1 through 56, shall be complied with, except where inconsistent with these rules." Because Rule 1:21-1C incorporates the UPA by reference, the Court examines the UPA and related legal authority. During the windup period, the LLP continues to exist, but only to wind up the partnership's affairs. The administrative activities conducted during the windup period are not the transacting of business for which a law-firm LLP was established. Accordingly, under the circumstances here, where a law-firm LLP has entered the windup period and has ceased to provide any legal services, the windup period does not constitute practicing law and no acts of malpractice could be committed during this period. Such a law firm is not required to maintain professional liability insurance under Rule 1:21-1C(a)(3). Here, W&O fully complied with the Rule's insurance mandate by maintaining malpractice insurance the entire time it was engaged in the practice of law. In addition, a law-firm LLP incurs its obligation to a client on the date the alleged malpractice occurred. Here, W&O was a valid LLP with professional liability insurance at the time of Olivo's alleged malpractice. (pp. 12-16)

3. In addition to erroneously determining that W&O was practicing law during its windup period, the trial court improperly relied on Rule 1:21-1C to convert W&O from an LLP to a GP. The Rule provides that "any violation of this rule by the limited liability partnership shall be grounds for the Supreme Court to terminate or suspend the limited liability partnership's right to practice law or otherwise to discipline it." R. 1:21-1C(a)(2) (emphasis added). Therefore, only the Supreme Court has the authority to discipline a law firm organized as an LLP. Moreover, the phrase "or otherwise discipline it" is circumscribed by a variety of sanctions imposed through the Court Rules. Because only the Court may use Rule 1:21-1C to discipline a law firm organized as an LLP, and because the Court Rules do not list conversion of business organizational form as a type of sanction, conversion of W&O from an LLP to a GP was improper. Moreover, the UPA's provisions that govern revocation of LLP status reflect a tendency to preserve the liability shield. Those provisions, combined with the lack of any language in the statutory scheme giving authority to the judiciary to convert a properly recognized LLP into a GP, lead to the conclusion that the UPA provides no support for the trial court's conversion of W&O from an LLP to a GP. (pp. 16-19)

4. The Court next addresses whether the mandate in Rule 1:21-1C(a)(3) to obtain malpractice insurance should carry into the future by requiring law-firm LLPs to maintain insurance after dissolution. Practical considerations and public policy concerns lead the Court to hold that tail coverage is not required. (pp. 19-21)

5. The effect of the Court's holding is that Mortgage Grader has no claim against Ward for vicarious liability; as a result, the AOM issue does not control the outcome. By way of guidance, the Court notes that even if Ward were not shielded from personal liability, Mortgage Grader was not obligated to serve an AOM on Ward. Mortgage Grader's claim against Ward was solely based on vicarious liability. Consequently, the allegations against Ward did not require a finding of whether Ward breached the professional standard of care in the legal profession. Therefore, Mortgage Grader's service of the AOM on Olivo and W&O was all that was required. (pp. 21-22)

The judgment of the Appellate Division is **AFFIRMED**.

**JUSTICE ALBIN, CONCURRING IN PART AND DISSENTING IN PART**, concurs in the judgment of the majority, but dissents from the majority's conclusion that an LLP does not have to maintain liability insurance during the LLP's windup period. He would amend Rule 1:21-1C to make explicit that lawyers operating as an LLP will be treated as a general partnership if they fail to maintain malpractice insurance and to require that an LLP carry malpractice insurance for a six-year period after its dissolution, if such insurance is reasonably available.

**CHIEF JUSTICE RABNER; JUSTICES LaVECCHIA, PATTERSON, and SOLOMON; and JUDGE CUFF (temporarily assigned) join in JUSTICE FERNANDEZ-VINA's opinion. JUSTICE ALBIN filed a separate opinion, concurring in part and dissenting in part.**

MORTGAGE GRADER, INC.,

     Plaintiff-Appellant,

         v.

WARD & OLIVO, L.L.P., and
JOHN OLIVO, ESQ.,

     Defendants,

         and

JOHN WARD, ESQ.,

     Defendant-Respondent.

        Argued February 1, 2016 – Decided June 23, 2016

        On appeal from the Superior Court, Appellate
        Division, whose opinion is reported at 438
        N.J. Super. 202 (App. Div. 2014).

        Dennis T. Smith argued the cause for
        appellant (Pashman Stein, attorneys; Mr.
        Smith and Michael J. Zoller, on the briefs).

        Daniel R. Bevere argued the cause for
        respondent (Piro, Zinna, Cifelli, Paris &
        Genitempo, attorneys; Mr. Bevere and Shane
        A. Sullivan, on the brief).

        Peter J. Gallagher argued the cause for
        amicus curiae New Jersey State Bar
        Association (Miles S. Winder III, President,
        attorney; Mr. Winder, of counsel; Mr.
        Gallagher and Mr. Winder, on the brief).

     JUSTICE FERNANDEZ-VINA delivered the opinion of the Court.

In this case, the Court must determine whether a law firm practicing as a limited liability partnership ("LLP") failed to maintain professional malpractice insurance to cover claims against it, and, if so, whether that failure may cause the revocation of the firm's LLP status, rendering innocent partners personally liable. To inform that determination, we also consider when a law-firm LLP incurs its obligation to a client under the Uniform Partnership Act ("UPA"). N.J.S.A. 42:1A-18.

For the reasons that follow, we conclude that the requirement in Rule 1:21-1C(a)(3) that law firms organized as LLPs maintain malpractice insurance does not extend to the firm's windup period and does not require purchase of tail insurance coverage. Moreover, Rule 1:21-1C(a)(3) is a disciplinary rule and this Court is solely responsible for attorney discipline. Consequently, violation of that Rule does not result in automatic conversion of a law firm organized as an LLP into a general partnership ("GP") and Mortgage Grader had no vicarious liability claim against Ward.

Therefore, we affirm the judgment of the Appellate Division.

I.

In July 2009, Mortgage Grader hired Olivo of Ward & Olivo ("W&O") to pursue claims of patent infringement against other entities. Mortgage Grader entered into settlement agreements in

2

those matters.  In exchange for one-time settlement payments, Mortgage Grader granted those defendant-entities licenses under the patents, including perpetual rights to any patents Mortgage Grader received or obtained through assignment, regardless of their relationship to the patents at issue in the litigation. It is those provisions of the settlement agreement that allegedly gave rise to legal malpractice.

On June 30, 2011, W&O dissolved and entered into its windup period.  It is undisputed that W&O continued to exist as a partnership for the sole purpose of collecting outstanding legal fees and paying taxes.  The next day, Ward formed a new LLP and began to practice with a new partner.  W&O's claims-made malpractice insurance policy ran through August 8, 2011.[1]  W&O did not purchase a "tail policy."[2]  Olivo sent Mortgage Grader a letter on May 10, 2012 on behalf of both Olivo Law Group, LLC

---

[1]  In a "claims-made" policy, the coverage is effective "if the negligent or omitted act is discovered and brought to the attention of the insurance company during the period of the policy."  Zuckerman v. Nat'l Union Fire Ins. Co., 100 N.J. 304, 310 (1985) (emphasis added) (quoting Samuel N. Zarpas, Inc. v. Morrow, 215 F. Supp. 887, 888 (D.N.J. 1963).  A "claims-made" policy provides no prospective coverage.  Ibid. (quoting Brander v. Nabors, 443 F. Supp. 764, 767 (N.D. Miss.), aff'd, 579 F.2d 888 (5th Cir. 1978)).  "Claims-made" policies may also offer limited or no retroactive protection for acts occurring prior to the policy's effective date.  Id. at 318-19.

[2]  "Tail" coverage is insurance beyond the effective dates of a "claims-made" policy.  Zuckerman, supra, 100 N.J. at 311.

and W&O, informing Mortgage Grader of the termination of legal services.

Mortgage Grader filed a complaint against W&O, Olivo, and Ward in October 2012. The complaint alleged legal malpractice by Olivo, claiming that the settlement agreements resulting from Olivo's representation harmed Mortgage Grader's patent rights. Specifically, the complaint alleged that the settlement agreements limited damages to past damages, failed to provide for royalty rates or licensing fees for future use of the patents, and failed to limit the licensing fee provision in the settlements to only the patents in the suit. Mortgage Grader thereafter filed an affidavit of merit ("AOM") pursuant to N.J.S.A. 2A:53A-27 to support its malpractice claims and served the AOM on Olivo and W&O, but failed to serve it on Ward.

Ward filed an answer and subsequently moved to dismiss for failure to state a claim. Ward argued that the requirement in Rule 1:21-1C, which provides that a law firm organized as an LLP must purchase malpractice insurance, is silent as to tail coverage following its dissolution. Ward also argued that, in any event, W&O had satisfied the Rule's requirement because W&O had insurance while it practiced law. Ward maintained that, as a result, W&O's liability shield remained intact and therefore he could not be held vicariously liable for Olivo's alleged

4

negligence.  Ward also claimed that Mortgage Grader never served him with an AOM as required by N.J.S.A. 2A:53A-27.

Mortgage Grader countered that W&O was still in operation and practicing law during its windup period, and that it was therefore required to maintain malpractice insurance pursuant to Rule 1:21-1C(a)(3) during that time.  Mortgage Grader contended that W&O's failure to maintain insurance stripped the LLP of its liability shield and converted it to a GP.  Mortgage Grader also claimed that it had substantially complied with the Affidavit of Merit Statute.

The motion court denied Ward's motion to dismiss.  The court first determined that Mortgage Grader had failed to comply with the statutory requirement to serve an AOM on each defendant named in the complaint, and rejected its substantial compliance argument.  However, the court also determined that W&O failed to maintain the requisite insurance, which caused its liability shield to lapse and relegated W&O to a GP.  Thus, the motion court concluded that Ward could be held vicariously liable for Olivo's alleged legal malpractice.

The Appellate Division reversed.  Mortgage Grader, Inc. v. Ward & Olivo, L.L.P., 438 N.J. Super. 202, 215 (App. Div. 2014).  The Appellate Division concluded that the UPA did not provide that a law firm organized as an LLP converts to a GP if it fails to maintain malpractice liability insurance.  Id. at 209-10

5

(citing N.J.S.A. 42:1A-18(c)). The panel also noted that Rule 1:21-1C(a)(3) states that the only remedies for an LLP's failure to maintain malpractice insurance are for this Court to terminate or suspend the LLP's right to practice law or otherwise discipline it. Because of this, and the fact that the Legislature has never amended the UPA to require conversion of an LLP to a GP as a sanction for failing to purchase a tail insurance policy, the panel found that a trial court has no authority to convert an otherwise properly organized LLP into a GP in order to sanction a partner for practicing without malpractice insurance. Id. at 211.

However, the panel declined to decide the issue of whether winding up a law practice constitutes "practicing law," and left that for the consideration of the Office of Attorney Ethics, the Disciplinary Review Board, or a district ethics committee. Id. at 212 n.6 (citing R. 1:20-1). Accordingly, the Appellate Division held that the trial court erred in converting W&O from an LLP to a GP when it failed to purchase a tail insurance policy, and concluded that Ward was shielded from personal liability as a result. Id. at 213.

Furthermore, the Appellate Division determined that Mortgage Grader failed to substantially comply with the Affidavit of Merit Statute because Mortgage Grader took no deliberate steps to comply with the statute, thus providing no

6

reasonable notice of the claim to Ward, whose personal assets would be at risk. Id. at 215.

We granted Mortgage Grader's motion for leave to appeal. 221 N.J. 216 (2015).

## II.

### A.

Mortgage Grader argues that law firms organized as LLPs in the windup period continue to exist as viable entities, and must therefore maintain professional liability insurance as required by Rule 1:21-1C(a)(3). Because malpractice insurance is a prerequisite to the formation of a law-firm LLP, Mortgage Grader contends that the natural consequence for non-compliance is the conversion of the LLP into a GP. Mortgage Grader maintains that is made possible by the open-ended provision in Rule 1:21-1C(a)(2) stating that the Court may "otherwise discipline" LLPs that fail to comply with the Rule that authorizes attorneys to operate as an LLP. Further, Mortgage Grader points to Olivo's termination of the attorney-client relationship in May 2012, nine months after W&O's malpractice insurance lapsed. Based on that, Mortgage Grader claims that no distinction exists between the windup period and pre-dissolution practice that would support an interpretation that the Rule does not require the purchase of tail coverage. Consequently, Mortgage Grader maintains that service of an AOM on Ward was not required

7

because the basis of the claim against him was vicarious liability as a member of a GP.

## B.

Ward counters that W&O complied with the Rule's insurance mandate because W&O maintained professional liability insurance during the entire time it was actively engaged in the practice of law, and after its policy lapsed, W&O existed solely to collect outstanding fees and pay taxes in an effort to wind up the partnership. According to Ward, neither Rule 1:21-1C(a)(3) nor the UPA mandates the purchase of tail coverage, and any determination to the contrary would constitute a dramatic change that should result only from this Court's rule-making function or from the State Legislature rather than as a result of motion practice in a trial court. Ward asserts that a mandate to purchase tail coverage would essentially require coverage perpetually into the future because the six-year statute of limitations for a professional malpractice claim would not apply to claims arising from representation on behalf of a minor or the drafting of a will.

Ward also argues that even if this Court determines that failure to obtain tail coverage violates Rule 1:21-1C(a)(3), neither the rule nor the UPA authorize a remedy of converting a law-firm LLP into a GP for failure to maintain malpractice insurance. In Ward's view, the failure of the Legislature and

8

the Supreme Court to provide for such a remedy demonstrates that such a remedy was never contemplated. Finally, Ward contends that Mortgage Grader failed to serve him with an AOM, and failed to substantially comply with the Affidavit of Merit Statute.

C.

Amicus curiae the New Jersey State Bar Association ("NJSBA"), also urges this Court to affirm the Appellate Division's determination that neither the UPA nor Rule 1:21-1C(a)(3) permits a court to convert a law-firm LLP to a GP for failure to maintain malpractice insurance. According to the NJSBA, the Legislature has been aware of the Rule since its enactment in 1996, yet has never sought to amend the UPA to allow for the conversion of an LLP to a GP.

In addition, the NJSBA points out that Rule 1:21-1C(a)(2) permits only this Court, not a trial court, to impose sanctions on an LLP that fails to comply with the mandate to maintain malpractice insurance. Even if this Court were to find policy reasons in favor of removal of LLP status as a sanction for non-compliance with the insurance mandate during the windup period, the NJSBA maintains that this Court should consider the imposition of such a sanction through its rule-making process rather than the present appeal. Finally, the NJSBA points out that mandating tail coverage would affect law-firm LLPs of all

9

sizes, and could disproportionately affect small LLPs and those that practice in particular areas of the law.

### III.

An appellate court interprets both statutes and court rules de novo.  State v. Tate, 220 N.J. 393, 405 (2015) (citing Willingboro Mall, Ltd. v. 240/242 Franklin Ave., L.L.C., 215 N.J. 242, 253 (2013)).  No deference is owed to "interpretation[s] of the law and the legal consequences that flow from established facts."  Manalapan Realty, L.P. v. Manalapan Twp. Comm., 140 N.J. 366, 378 (1995); see also State v. Drury, 190 N.J. 197, 209 (2007) (defining the de novo standard of review).  Rather, this Court looks directly to the relevant statutes and rules.  Merin v. Maglaki, 126 N.J. 430, 434 (1992) ("Construction of any statute necessarily begins with consideration of its plain language."); see also First Resolution Inv. Corp. v. Seker, 171 N.J. 502, 511 (2002) (noting that interpretation of court rules is guided by tenets of statutory construction).

### IV.

We first determine whether the malpractice insurance mandate of Rule 1:21-1C(a)(3) applies to the windup period.  The New Jersey Constitution grants this Court "jurisdiction over the admission to the practice of law and the discipline of persons admitted."  N.J. Const. art. VI, § 2, ¶ 3.  Effective January 1,

10

1997, we added Rule 1:21-1C to permit attorneys to organize as LLPs. The LLP structure establishes a shield from personal liability for LLP partners. See R. 1:21-1C(a)(1) (incorporating UPA by reference); N.J.S.A. 42:1A-18(a) & (c).[3]

Rule 1:21-1C conditions practice by law-firm LLPs on compliance with partnership law, adherence to the rules of professional responsibility, and maintenance of malpractice insurance. Specifically, section (a) provides that "[a]ttorneys may engage in the practice of law as limited liability partnerships" provided that

> [t]he limited liability partnership shall obtain and maintain in good standing one or more policies of lawyers' professional liability insurance which shall insure the limited liability partnership against liability imposed upon it by law for damages resulting from any claim made against the limited liability partnership by its clients arising out of the performance of professional services by attorneys employed by the limited liability partnership in their capacity as attorneys.
>
> [R. 1:21-1C(a)(3) (emphasis added).]

The plain language of Rule 1:21-1C ties the mandate to carry malpractice insurance to damages from the performance of

---

[3] However, for foreign LLPs, the rule provides that an attorney "shall not be shielded from personal liability for his or her own negligence, omissions, malpractice, wrongful acts, or misconduct, and that of any person under his or her direct supervision and control while rendering professional services on behalf of the limited liability partnership." R. 1:21-1C(a)(1).

11

"professional services." We find no indication that the administrative activities characterizing a windup are included within that term. Cf. Cal. Corp. Code § 16956(a)(2)(A) (stating that "[u]pon the dissolution and winding up of the partnership, the partnership shall, with respect to any insurance policy or policies then maintained pursuant to this subparagraph, maintain or obtain an extended reporting period endorsement or equivalent provision in the maximum total aggregate limit of liability required to comply with this subparagraph for a minimum of three years if reasonably available from the insurer").

In addition to the plain language of the insurance mandate, subsection (a)(1) of Rule 1:21-1C instructs that "[a]ll provisions of the Uniform Partnership Act, N.J.S.A. 42:1A-1 through 56, shall be complied with, except where inconsistent with these rules." R. 1:21-1C(a)(1). Because Rule 1:21-1C incorporates the UPA by reference, we next examine the language of the UPA and related legal authority.

A partnership's existence continues during the windup period and "is terminated when the winding up of its business is completed." N.J.S.A. 42:1A-40(a). Under the UPA, "the express will of all of the partners to wind up the partnership business" causes dissolution and commences the winding up of a partnership. N.J.S.A. 42:1A-39(b)(2). At any time prior to the completion of the winding up of a partnership, all of the

12

partners "may waive the right to have the partnership's business wound up and the partnership terminated." N.J.S.A. 42:1A-40(b). In that event, "the partnership resumes carrying on its business as if dissolution had never occurred, and any liability incurred by the partnership or a partner after the dissolution and before the waiver is determined as if dissolution had never occurred." N.J.S.A. 42:1A-40(b)(1) (emphasis added). The windup period is temporally indeterminate under the UPA due to the partners' ability to waive dissolution and because winding up is limited in terms of activity.

During the windup period, the LLP continues to exist, but only to wind up the partnership's affairs. "On dissolution the partnership is not terminated, but continues until the winding up of partnership affairs is completed, and for that purpose alone." Scaglione v. St. Paul-Mercury Indemn. Co., 28 N.J. 88, 102 (1958). "A dissolved corporation exists solely to prosecute and defend suits, and not for the purpose of continuing the business for which it was established." Lancellotti v. Maryland Casualty Co., 260 N.J. Super. 579, 583 (App. Div. 1992) (citing Leventhal v. Atl. Rainbow Painting Co., Ltd., 68 N.J. Super. 406, 412 (App. Div. 1961)). Our Appellate Division in addressing this issue has previously held that "dissolution is distinguished from termination of the partnership business; despite dissolution, the partnership continues for the purpose

of winding up partnership affairs." Wilzig v. Sisselman, 182 N.J. Super. 519, 525 (App. Div. 1982) (citing N.J.S.A. 42:1-30; Scaglione v. St. Paul-Mercury Indem. Co., 28 N.J. 88, 102 (1958)) (emphasis added). "[D]issolution designates the point in time when the partners cease to carry on the business together; termination is the point in time when all the partnership affairs are wound up; winding up, the process of settling partnership affairs after dissolution." Insulation Corp. of Am. v. Berkowitz, 274 N.J. Super. 337, 344 (App. Div. 1994) (citing Official Comment, Uniform Partnership Act § 29, 6 U.L.A. at 365 (1969)) (emphasis added). Similarly, N.J.S.A. 14:12-9 would bar professional corporations from practicing law during the windup period. See N.J.S.A. 14A:12-9 (stating that a dissolved corporation "shall carry on no business except for the purpose of winding up its affairs"). The UPA sets forth activities that do not constitute "transacting business": "collecting debts or foreclosing mortgages or other security interests in property securing the debts, and holding, protecting, and maintaining property so acquired." N.J.S.A. 42:1A-53(a)(8). In sum, the important distinction pertaining to LLP liability is the point in time at which an LLP enters dissolution, commences winding up its affairs, and thus ceases to engage in the business for which it was created.

14

We consider the UPA and the case law interpreting it to be dispositive on this issue. The administrative activities conducted during the windup period are not the transacting of business for which a law-firm LLP was established. Accordingly, we conclude that under the circumstances here, where a law-firm LLP has entered the windup period and has ceased to provide any legal services, the windup period does not constitute practicing law and therefore no acts of malpractice could be committed during this period. Such a law firm is not required to maintain professional liability insurance under Rule 1:21-1C(a)(3). Therefore, W&O fully complied with the Rule's insurance mandate by maintaining malpractice insurance the entire time it was engaged in the practice of law.

Similarly, the date on which W&O incurred its alleged obligation to Mortgage Grader is also dispositive. The National Conference of Commissioners on Uniform State Laws (the "National Conference"), in its comment to the Revised Uniform Partnership Act ("RUPA"), the proposed legislation New Jersey adopted and codified as the UPA, provides in part that "partnership obligations under or relating to a note, contract, or other agreement generally are incurred when the note, contract, or other agreement is made." RUPA (1997), Comment 3 to Section 306, at 51. "Partnership obligations under or relating to a tort generally are incurred when the tort conduct occurs rather

15

than at the time of the actual injury or harm." Ibid. Therefore, we hold that a law-firm LLP incurs its obligation to a client on the date the alleged malpractice occurred. Here, W&O was a valid LLP with professional liability insurance coverage at the time of Olivo's alleged malpractice.

Our holding precludes Mortgage Grader from maintaining a vicarious liability claim against Ward. Our analysis does not end there, however, because we next address the trial court's conversion of W&O from an LLP into a GP.

V.

A.

In addition to erroneously determining that W&O was still practicing law during its windup period, the trial court improperly relied on Rule 1:21-1C to convert W&O from an LLP to a GP. The Rule provides that "any violation of this rule by the limited liability partnership shall be grounds for the Supreme Court to terminate or suspend the limited liability partnership's right to practice law or otherwise to discipline it." R. 1:21-1C(a)(2) (emphasis added). Therefore, only this Court has the authority to discipline a law firm organized as an LLP. Here, the trial court erred by relying on a disciplinary rule that only this Court may use.

Moreover, the phrase "or otherwise discipline it" is circumscribed by a variety of sanctions imposed through the

16

court rules.  See, e.g., R. 1:20-15A (listing disbarment, indeterminate suspension, term of suspension, censure, reprimand, and admonition as categories of discipline); see also In re Aponte, 215 N.J. 298, 298-99 (2013) (censuring attorney who failed to maintain liability insurance while practicing as professional corporation in violation of Rule 1:21-1A(a)(3), among other violations, and requiring reimbursement of expenses associated with his prosecution).  Because only this Court may use Rule 1:21-1C to discipline a law firm organized as an LLP, and the Court Rules do not list conversion of business organizational form as a type of sanction, we conclude that conversion of W&O from an LLP to a GP was improper under the Rule.

### B.

Our analysis does not end with Rule 1:21-1C because we must also determine if the UPA provides authority to convert an LLP to a GP.  The UPA defines a partnership as "an association of two or more persons to carry on as co-owners of a business for profit formed under [N.J.S.A. 42:1A-10], predecessor law, or comparable law of another jurisdiction."  N.J.S.A. 42:1A-2. With certain exceptions, "all partners are liable jointly and severally for all obligations of the partnership."  N.J.S.A. 42:1A-18(a).  By contrast,

17

> [a]n obligation of a partnership <u>incurred while the partnership is a limited liability partnership</u>, whether arising in contract, tort, or otherwise, is solely the obligation of the partnership. A partner is not personally liable, directly or indirectly, by way of contribution or otherwise, for such an obligation solely by reason of being or so acting as a partner.
>
> [<u>N.J.S.A.</u> 42:1A-18(c) (emphasis added).]

The UPA further provides that the status of an LLP "remains effective, regardless of changes in the partnership" until the LLP cancels its status under <u>N.J.S.A.</u> 42:1A-6(d) or the State Treasurer revokes its status under <u>N.J.S.A.</u> 42:1A-49(c) for failure to file an annual report when due or pay the required filing fee under <u>N.J.S.A.</u> 42:1A-49. <u>N.J.S.A.</u> 42:1A-47(e).

The UPA's provisions that govern revocation of LLP status reflect a tendency to preserve the liability shield. In the event that the State Treasurer seeks to revoke an LLP's status for failure to file an annual report or pay the filing fee, the UPA requires that the LLP receive sixty days' notice of the impending revocation. <u>N.J.S.A.</u> 42:1A-49(c). During this time period, the LLP has an opportunity to cure the deficiency before the effective date of the revocation. <u>Ibid.</u> If the LLP cures, the revocation does not take effect. <u>Ibid.</u> The UPA also permits an LLP to apply for reinstatement within two years after the effective date of revocation. <u>N.J.S.A.</u> 42:1A-49(e). If the LLP applies and reinstatement is granted, the reinstatement

18

relates back to and takes effect as of the effective date of the revocation, and the LLP's status continues as if the revocation never occurred. N.J.S.A. 42:1A-49(f). The National Conference explains that "[t]he relation back doctrine protects gaps in the reinstated partnership's liability shield." RUPA (1997), comment to Section 1003, at 147.

In sum, the UPA offers many mechanisms to preserve LLP status once obtained, and those mechanisms apply retroactively to sustain the partnership's liability shield even during gaps in LLP status. Those provisions, combined with the lack of any language in this statutory scheme giving authority to the judiciary to convert a properly recognized LLP into a GP, lead us to conclude that the UPA provides no support for the trial court's conversion of W&O from an LLP to a GP.

VI.

We now address whether the mandate in Rule 1:21-1C(a)(3) to obtain malpractice insurance should carry into the future by requiring law-firm LLPs to maintain insurance after dissolution. Practical considerations and public policy concerns lead us to hold that tail coverage is not required.

Because a claims-made policy provides coverage only for claims made while the policy is in effect, we cannot impose a requirement for an LLP to purchase tail coverage without deciding how long the tail coverage must last. Even if such a

19

requirement were tailored to meet the six-year statute of limitations for malpractice actions, it would fail to ensure coverage for all possible claims.  For example, a malpractice claim involving an attorney who handled a claim on behalf of a minor could result in the tolling of the statute of limitations until the minor reached adulthood, meaning the minor could file a timely claim more than six years after the malpractice.  Similarly, a dispute regarding a will an attorney drafted in all likelihood would not arise until after the client's death, which may occur much longer than six years after the drafting of the will.

In addition, competing public policy concerns play a role in our analysis.  "On the one hand, Rule 1:21-1C provides attorneys the opportunity to practice in a chosen entity that includes limited liability for its members.  On the other, it seeks to protect consumers of legal services from attorney malpractice by requiring such entities to maintain adequate insurance."  First Am. Title Ins. Co. v. Lawson, 177 N.J. 125, 139 (2003).  Ultimately, we determined, "the rule helps to limit the public's exposure to uninsured risks arising from the receipt of legal services in this State."  Ibid.

This insurance requirement for law-firm LLPs marks a departure from the general rule that malpractice insurance is not required for attorneys in New Jersey.  Our rules do not

20

require tail coverage for professional corporations or GPs, nor do they require single practitioners to carry any insurance, including tail coverage.

We decline to impose a tail requirement on attorneys who choose to practice as LLPs, particularly because a mandate to purchase tail coverage still would not fully protect the public from uninsured risks due to the types of scenarios outlined above.[4]  We hold that the mandate in <u>Rule</u> 1:21-1C for LLPs to purchase professional liability insurance does not include any requirement to purchase tail coverage.

The effect of our holding in the present case is that Mortgage Grader has no claim against Ward for vicarious liability.  Nevertheless, Mortgage Grader may still pursue its malpractice claims against Olivo and W&O.

VII.

Finally, because our holding results in Mortgage Grader having no claim against Ward, the affidavit of merit issue does not control the outcome of this matter.  However, for guidance we provide the following comments.

---

[4] The dissent posits that law-firm LLPs could avoid the problem of tail coverage altogether by purchasing occurrence policies. However, there is no evidence in this record or otherwise made available to us that occurrence policies are available to insure against professional malpractice claims.  Indeed, neither the parties nor amicus raised such a suggestion in their positions to this Court.

"[W]hen asserting a claim against a professional covered by the affidavit of merit statute . . . a claimant should determine if the underlying factual allegations of the claim require proof of a deviation from the professional standard of care for that specific profession." Couri v. Gardner, 173 N.J. 328, 341 (2002). "If such proof is required, an affidavit of merit shall be mandatory for that claim, unless [an exception applies]." Ibid.; see also Hubbard v. Reed, 168 N.J. 387, 390 (2001) (holding that affidavit of merit is not required in common knowledge cases). A claim of vicarious liability requires proof of a particular legal relationship to the person that allegedly acted negligently or deviated from a professional standard of care, not proof of negligence or deviation from a professional standard of care.

Here, even if Ward were not shielded from personal liability as a partner of W&O, Mortgage Grader was not obligated to serve an AOM on Ward. Mortgage Grader's claim against Ward was solely based on vicarious liability. Consequently, the allegations against Ward did not require a finding of whether Ward breached the professional standard of care in the legal profession. Therefore, Mortgage Grader's service of the affidavit of merit on Olivo and W&O was all that was required.

VIII.

22

For the reasons set forth above, we hold that the mandate in Rule 1:21-1C that a law-firm LLP purchase professional liability insurance does not extend to the windup period when the law firm has ceased performing legal services.  In addition, we hold that Rule 1:21-1C does not require law-firm LLPs to purchase tail coverage to maintain malpractice insurance beyond dissolution.  Further, we affirm the Appellate Division's conclusion that a trial court does not have the authority to convert a law-firm LLP into a GP.

IX.

The judgment of the Appellate Division is affirmed.


CHIEF JUSTICE RABNER; JUSTICES LaVECCHIA, PATTERSON, and SOLOMON; and JUDGE CUFF (temporarily assigned) join in JUSTICE FERNANDEZ-VINA's opinion.  JUSTICE ALBIN filed a separate opinion, concurring in part and dissenting in part.

MORTGAGE GRADER, INC.,

     Plaintiff-Appellant,

        v.

WARD & OLIVO, L.L.P., and
JOHN OLIVO, ESQ.,

     Defendants,

        and

JOHN WARD, ESQ.,

     Defendant-Respondent.


JUSTICE ALBIN, concurring in part and dissenting in part.

Lawyers operating as a limited liability partnership (LLP), pursuant to Rule 1:21-1C, are shielded from vicarious liability for the malpractice of their partners. The rule's quid pro quo is that the LLP must carry adequate malpractice insurance "to protect consumers of legal services." First Am. Title Ins. Co. v. Lawson, 177 N.J. 125, 139 (2003) (explaining relationship between liability shield and insurance requirement under Rule 1:21-1C).

I cannot agree with the majority's holding that the law firm of Ward & Olivo, before its dissolution as an LLP, did not

1

have an obligation to carry malpractice insurance pursuant to Rule 1:21-1C during the wind-up period, while it was still collecting client fees.[1]  The majority's conclusion means that an LLP, while winding up business, can collect fees from a client, but has no responsibility to maintain insurance to compensate that client for an earlier act of malpractice.  In my view, even the most rigid interpretation of Rule 1:21-1C does not compel such an inequitable result.

I concur with the majority that Rule 1:21-1C, as currently written, does not provide the remedy of stripping the partners of the liability shield for their failure to maintain malpractice liability insurance.  Although that remedy does not accord with the letter of the rule, it is in keeping with the spirit of the rule.  Lawyers operating as an LLP should not expect that they can hide behind the liability shield while failing to maintain the required amount of malpractice insurance.  Therefore, I would amend Rule 1:21-1C to make explicit that lawyers operating as an LLP will be treated as a general partnership if they fail to maintain malpractice insurance.  Additionally, I would amend the rule to require that an LLP carry malpractice insurance for a six-year period after

---

[1] "Winding up" is "[t]he process of settling accounts and liquidating assets in anticipation of a partnership's or a corporation's dissolution."  Black's Law Dictionary 1835 (10th ed. 2014).

its dissolution, if such insurance is reasonably available. Tail coverage will ensure that the law firm's last client has as much financial protection as the firm's first client.[2]

I.

In a general partnership, each partner in a law firm is vicariously liable for the malpractice of every other partner. See N.J.S.A. 42:1A-18(a). Thus, a client wronged by the malpractice of one partner can seek full satisfaction of a judgment from other partners. See ibid.

This Court adopted Rule 1:21-1C in 1996 to allow attorneys to practice law in a limited liability partnership, provided the partnership secured malpractice liability insurance in an amount of not less than $100,000 for each attorney employed by the LLP. R. 1:21-1C. The legal structure of an LLP shields one partner from vicarious liability for the malpractice of another partner. See N.J.S.A. 42:1A-18(c).

Rule 1:21-1C(a)(3) provides that "[a]ttorneys may engage in the practice of law as limited liability partnerships . . . provided that" the LLP "shall obtain and maintain in good standing one or more policies of lawyers' professional liability

---

[2] "Tail coverage, also referred to as an extended reporting period, extends the time within which a claim may be made after the cancellation or expiration of a particular claims-made policy." Home Ins. Co. v. Law Offices of Jonathan DeYoung, P.C., 32 F. Supp. 2d 219, 224 (E.D. Pa. 1998).

insurance." The trade-off for the liability shield of Rule 1:21-1C is that the attorneys operating as an LLP must maintain malpractice liability insurance. See First Am. Title, supra, 117 N.J. at 139. Thus, in exchange for protection from lawsuits premised on vicarious liability, partners must provide adequate financial security in the form of insurance for their clients. Common sense and public policy suggest that partners not be permitted to seek shelter behind the liability shield of an LLP when they have not maintained malpractice insurance. Rule 1:21-1C should provide a remedy equal to the violation of the mandatory malpractice insurance requirement.

The current rule has a limited set of sanctions for an LLP's failure to maintain malpractice insurance: "Any violation of this rule by the limited liability partnership shall be grounds for the Supreme Court to terminate or suspend the limited liability partnership's right to practice law or otherwise to discipline it." R. 1:21-1C(a)(2). It does not provide the remedy of rendering the partners jointly and severally liable for the LLP's failure to maintain insurance. In this case, under the current rule, Ward is not jointly and severally liable for the malpractice of his partner, despite the fact that he and his partner continued to operate as an LLP, collecting fees from clients during the wind-up period, while

4

not carrying claims-made legal malpractice insurance.[3]

In the scenario sanctioned by the majority, partners in an LLP can collect fees from a client during the wind-up period and not maintain malpractice insurance without ever violating Rule 1:21-1C. Yet, if the same attorneys were operating as a general partnership -- and not in the form of an LLP -- they would be vicariously liable. See N.J.S.A. 42:1A-18(a). The attorneys in this case should be in no better position than attorneys operating as a general partnership when they are sued for malpractice.

Other jurisdictions that permit attorneys to operate as an LLP conditioned on maintaining malpractice insurance provide a remedy commensurate with a breach of the insurance requirement. Colorado, Delaware, Illinois, Indiana, Massachusetts, Nebraska, Ohio, Oklahoma, and Washington explicitly state in their statutes or court rules that LLPs lose their liability shield when they fail to maintain adequate malpractice insurance. See Colo. R. Civ. P. 265(a)(2) (imposing joint and several liability on partners of LLP unless LLP has minimum amount of malpractice insurance); Del. Sup. Ct. R. 67(h)(ii)(1) (imposing joint and

---

[3] Under a claims-made policy, the policyholder is protected "if the negligent or omitted act is discovered and brought to the attention of the insurance company during the period of the policy." Zuckerman v. Nat'l Union Fire Ins. Co., 100 N.J. 304, 310 (1985) (quoting Samuel N. Zarpas, Inc. v. Morrow, 215 F. Supp. 887, 888 (D.N.J. 1963)).

several liability for partners of LLPs if LLP does not maintain malpractice insurance); <u>Ill. Sup. Ct. R.</u> 722(b)(1) (stating that failure of LLP to maintain minimum insurance subjects partners to joint and several liability for rule's minimum per claim amount, and to higher per claim amount if failure to maintain insurance is fraudulent or willful); <u>Ind. Admission & Discipline R.</u> 27(h) (imposing joint and several liability on partners if LLP "fails to have the professional liability insurance or other form of adequate financial responsibility required by" rule); <u>Mass. Sup. Jud. Ct. R.</u> 3:06(3)(c) (imposing joint and several liability on partners if LLP "fails to maintain insurance or a fund in the Designated Amount in compliance with this rule"); <u>Neb. Sup. Ct. R.</u> 3-201(C)(7)(b)(iv), (C)(7)(c) (stating that if LLP does not maintain professional liability insurance, partners "shall be jointly and severally liable to the extent that the assets of the organization are insufficient to satisfy any liability incurred by the corporation for" malpractice of its partners); <u>Ohio Gov.Bar.R.</u> III(4) (imposing joint and several liability for partners of LLPs "to the extent that the firm fails to have the professional liability insurance or other form of adequate financial responsibility required by this rule"); <u>Okla. Stat.</u> tit. 54, § 1-309 (stating that failure to comply with liability insurance requirement for LLP renders partners jointly liable); <u>Wash. Rev. Code</u> § 25.05.125 (stating that

partners are personally liable if LLP fails to maintain "a policy of professional liability insurance . . . or other evidence of financial responsibility . . . to the extent that, had such insurance . . . or other evidence of responsibility been maintained, it would have covered the liability in question").

We should adopt the approach taken by those jurisdictions. We should amend Rule 1:21-1C to provide that lawyers who operate as an LLP and fail to maintain malpractice insurance lose their liability shield if their partners are sued for malpractice.

## II.

As indicated earlier, attorneys operating as an LLP should maintain malpractice insurance during the windup of business. In addition, the rule should require that an LLP secure tail coverage for a reasonable period after the LLP's dissolution, to give adequate financial protection to all the law firm's clients, not just the first ones through the door.

Inevitably, there will be a time lag between an act of legal malpractice, its discovery by a client, and the filing of a lawsuit. Under a claims-made policy, as in the case before us, insurance coverage is available only if the law firm has insurance in the year that the claim is filed. So, for example, if lawyers operating as an LLP represent clients from January 1 through June 30 and dissolve the LLP on July 1 without securing

7

tail coverage, the liability shield will be in place and those clients with valid claims after July 1 will not have the financial security of insurance coverage.

In California, attorneys operating as an LLP must maintain insurance coverage during the wind-up period and for a minimum of three years after the LLP's dissolution. Cal. Corp. Code § 16956(a)(1)(A) ("Upon the dissolution and winding up of the partnership, the partnership shall" maintain a policy of liability insurance "for a minimum of three years if reasonably available from the insurer."). The California approach is sensible because it protects clients whose claims come to light after the LLP is no longer a going concern. A new rule can mirror the California statute to include an exception for cases in which liability insurance is not reasonably available.

The statute of limitations for the filing of legal malpractice claims in New Jersey is six years. N.J.S.A. 2A:14-1; McGrogan v. Till, 167 N.J. 414, 420 (2001). The purpose of Rule 1:21-1C is to ensure that attorneys practicing as an LLP have insurance coverage to provide clients wronged by malpractice a remedy. Thus, this Court should require lawyers engaging in the practice of law as an LLP to secure tail coverage for six years after the LLP's dissolution, if such coverage is reasonably available. This tail-coverage period will provide equality of coverage for the firm's first and last

8

clients.  To that end, mandating six years of tail coverage will protect clients whose malpractice claims have not come to light before attorneys dissolve their LLPs.

Because we cannot protect those clients whose malpractice claims may arise six years after an LLP's dissolution is no reason not to protect those clients who file claims within a reasonable period after the dissolution.  I do not accept the majority's position that because we cannot protect everyone, we should protect no one.

If a law firm can secure an occurrence policy, then tail coverage is unnecessary because clients will have insurance coverage for any act of malpractice committed during the life of the LLP.[4]  Those lawyers unwilling to make the financial commitment to provide adequate insurance coverage for clients during the existence of the LLP, or during a wind-up period, or for a reasonable period after the LLP's dissolution can always practice in a general partnership.  They should not, however, have the benefit of the LLP's liability shield if the quid pro quo of insurance coverage is not honored.

III.

---

[4] Under an occurrence policy, attorney malpractice would be the occurrence that is insured.  See Templo Fuente De Vida Corp. v. Nat'l Union Fire Ins. Co., 224 N.J. 189, 201 (2016).  Under such a policy, so long as the act of malpractice occurred during the life of the policy, coverage attaches.  Ibid.

9

The New Jersey Constitution vests this Court with rulemaking authority over practice and procedure in our courts and the manner in which lawyers may practice law in this State. See N.J. Const. art. VI, § 2, ¶ 3. Pursuant to that authority, this Court adopted the current version of Rule 1:21-1C. This case has illuminated deficiencies in the rule that place clients and the public at risk. This Court therefore should exercise its constitutional authority and amend the current rule. Lawyers practicing in LLPs should no longer be able to invoke the liability shield of an LLP if they have not maintained adequate malpractice liability insurance during the life of the LLP and for a six-year period after its dissolution. In the event of non-compliance, the lawyers should be treated as though they were practicing in a general partnership and be subject to vicarious liability in cases of legal malpractice.

I concur in the judgment of the majority. However, I dissent from the majority's conclusion that an LLP does not have to maintain liability insurance during the LLP's wind-up period. I also would amend Rule 1:21-1C to require lawyers engaging in the practice of law as an LLP to secure tail coverage for a six-year period after the LLP's dissolution, if such coverage is reasonably available.

10